FILED

09/24/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 15, 2020

## IN RE CHEYENNE S. ET AL.

**Appeal from the Juvenile Court for Knox County**
**No. 164018   Timothy E. Irwin, Judge**

_____

### No. E2019-01659-COA-R3-PT

_____

A mother appeals the termination of her parental rights to her children. The juvenile court determined that four statutory grounds supported terminating her parental rights: abandonment by failure to establish a suitable home; failure to substantially comply with the permanency plan; persistence of conditions; and her failure to manifest an ability and willingness to assume custody of her children. The court also determined that termination of the mother's parental rights was in the best interests of her children. Upon our review, we conclude there was clear and convincing evidence supporting both the grounds for termination and the best interest determination. So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Martha S.

Herbert H. Slatery III, Attorney General and Reporter, and Amber Seymour, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

In June 2016, the Tennessee Department of Children's Services (the "Department") received reports from neighbors of Martha S. ("Mother") that two of her children, ages three and two, were running and playing in the street unattended. The neighbors attempted to alert Mother. But she was behind a locked bedroom door with another child, age six, and the children's putative father and could not be roused. The

neighbors also reported incidents of domestic violence in Mother's home and other concerns over the home environment.

A couple of days after the report, the Department interviewed Mother at her home. The petition for temporary legal custody described the home's condition and that of Mother's children.

> During this home visit, the Department observed feces on the floor, smeared into carpets, and on the door to the first bedroom. In the second bedroom, a child's toilet with urine inside and on the seat was observed. [The two-year-old] placed her doll into this toilet during the interview. In the bathroom, feces and urine were observed in the toilet and a used tampon was observed on the sink. Marijuana was observed on the couch in the living room. [The three-year-old] was observed lying on this couch during the interview. The back bedroom was strewn with clothes and dirty diapers. The refrigerator was observed to be empty other than a bottle of coke and a bottle of orange juice. The kitchen cabinets had a box of cereal, rice, and a coffee tub. [The three-year-old] was observed in his underwear with feces on his leg. [Mother] took him inside and changed him and cleaned his leg. All three children had brown and black dirt on their faces around their mouths and on their arms and legs[,] and all three were observed to be barefoot with black feet. When the Department first arrived, [the three-year-old and two-year-old] were both observed to only have on diapers that were sagging to the floor. [Mother] changed both children after the Department arrived.

The day the petition was filed, July 6, 2016, the juvenile court granted the Department temporary legal custody of Mother's three children.

The juvenile court subsequently found the children to be dependent and neglected "due to the mother's domestic violence and environmental neglect issues." The court ratified multiple family permanency plans for Mother with the alternative goals of returning the children to the parent or adoption. And in 2018, a trial home placement with Mother was attempted. But the court ended the experiment early because Mother could not "be protective of the children and she . . . allowed inappropriate people in the home." The court also found that Mother had not made progress with the cleanliness of her home.

Nearly thirty-two months after the children's removal, the Department petitioned the juvenile court to terminate Mother's parental rights.[1] Following a one-day trial, the

---

[1] The Department filed a separate petition to terminate the parental rights of the putative father. Because the father's parental rights are not at issue in this appeal, we only discuss the father to the extent

court granted the petition.  It concluded that there was clear and convincing evidence of four statutory grounds for terminating Mother's parental rights.  *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2019).  The court further concluded that the evidence was clear and convincing that termination of Mother's parental rights was in the children's best interest. *See id.* § 36-1-113(c)(2).

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child.  *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995).  But parental rights are not absolute.  *In re Angela E.*, 303 S.W.3d at 250.  State statute identifies those circumstances in which the government's interest in the welfare of a child justifies interference with a parent's constitutional rights.  *See* Tenn. Code Ann. § 36-1-113(g).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights.  *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g).  Tenn. Code Ann. § 36-1-113(c)(1).  If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest.  *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence.  *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)).  This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.*  "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence."  *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992).  It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established.  *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise."  *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P.

necessary to address the termination of Mother's parental rights.

13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Mother argues that the evidence does not clearly and convincingly support the statutory grounds relied on by the juvenile court for terminating her parental rights. Mother also argues that the evidence does not clearly and convincingly support the finding that termination of her parental rights was in the children's best interest.

1. Abandonment - Failure to Provide a Suitable Home

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). Abandonment as a ground for termination is defined in five different ways. *See id.* § 36-1-102(1)(A) (Supp. 2019) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned her children under the second definition of "abandonment."

The second definition of "abandonment" considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii). Under Tennessee Code Annotated § 36-1-102(1)(A)(ii), termination of parental rights may be appropriate if:

> (a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the [D]epartment . . . ;
> (b) The juvenile court found . . . that the [D]epartment . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (c) For a period of four (4) months following the physical removal, the [D]epartment . . . made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that the [parent] will be able to provide a suitable home for the child at an early date.

4

Mother's argument focuses on subpart (c) of the second definition of "abandonment" and the four month period following the physical removal of her children. Mother describes the proof as "clear" that she "had established a suitable home at some point between the removal [of the children] on July 6, 2016 and the Trial Home Placement of September 11, 2018." The Department counters that the trial home placement ended because Mother lacked a suitable home.

We conclude that the evidence clearly and convincingly supports the finding of abandonment by failure to provide a suitable home. A "suitable home" means something "more than a proper physical living location." *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

Here, the proof showed that Mother did not even provide a proper physical living location. When it ended the trial home placement, the court found that Mother had issues with the cleanliness of her home. The case manager testified that Mother had been provided in-home services to teach her how to keep her home clean. Yet, when the case manager visited the home during the trial home placement, she found trash everywhere.

Mother also could not demonstrate that she could care for the children. At least one of the children came down with scabies. The case manager also reported that there were truancy issues with the children during the trial home placement. According to the case manager, Mother claimed "she couldn't get [the children] up and she couldn't get them [to school]."

And the home was not free of domestic violence. The case manager testified that the children's safety in the home was her biggest concern because of incidents of domestic violence. The violence stemmed from Mother allowing the putative father, his mother, and Mother's brother in the home. The court specifically noted these "inappropriate people" when it ended the trial home placement.

2. Substantial Noncompliance

The juvenile court also found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). The first family permanency plan, ratified in September 2016, had the goal of returning the children to Mother. To accomplish the goal, the plan contemplated that Mother would provide a clean home, free of pests and trash; not incur any further legal charges; participate in domestic violence education; receive case management services including

addressing her domestic violence history and decision making skills as they relate to interactions with the children; maintain suitable housing; visit regularly with the children and allow the Department to visit her home at least quarterly; keep her driver's license and registration and insurance current; have a legal source of income; and provide the Department with updated information about her prescription history.

Not surprisingly given the length of time the children remained in the Department's custody, several permanency plans were developed after the first. The plan following the first added the alternative goal of adoption of the children. Plans developed in 2018 added additional responsibilities related to domestic violence, including notifying the Department of domestic violence incidents and staying away from domestic-violence perpetrators. The later plans also required Mother to take all prescribed medications; complete a mental health assessment and follow any recommendations; participate in group therapy; attend parenting classes; participate in a parenting assessment; sign provider releases; complete parenting skills and family conflict counseling; interact with the children in an age-appropriate manner and demonstrate appropriate discipline during visits; and pay child support.

Before considering a parent's compliance with a permanency plan, the court must find that the permanency plan requirements were "reasonable and . . . related to remedying the conditions that necessitate[d] foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (Supp. 2019); *In re Valentine*, 79 S.W.3d at 547. Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

The children entered foster care primarily due to domestic violence and environmental neglect issues. We agree with the juvenile court that the requirements of the plan were reasonable and related to remedying these concerns.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See id.* at 547. But whether any noncompliance constitutes "[s]ubstantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. Our concern is with the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004).

Mother argues that the fact that she was allowed a trial home placement demonstrated that she was in compliance with her permanency plan. We disagree.

6

We conclude that the evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plans. Other than participating in visitation and having legal employment for an undetermined time, Mother made little to no effort to address the other requirements of her plan. Mother did not complete her domestic violence classes or comply with the recommendations following her mental health evaluation.

Mother did not keep her home free of pests and trash. Despite providing Mother with services designed to teach her how to get her home clean, the case manager testified to several concerns when they could get access to the home. In addition, Mother continued to allow inappropriate people into the home including a homeless person and people who were known perpetrators of domestic violence.

3. Persistence of Conditions

The juvenile court also found termination of Mother's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). This ground for termination focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d at 555. So the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

At the time of trial, the children had been removed from Mother's custody for more than six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). And this record contains clear and convincing evidence that the conditions preventing the children's safe return to Mother remained. Throughout the three years that the children were in foster care, the Department continued to visit Mother's home. The family service workers found half-eaten food lying out on tables with flies and bugs surrounding them. There was often a lack of food in the house. And there were several instances of Father, Father's mother, and Mother's brother being present at the home causing calls to the police because of disagreements and altercations.

We further conclude that the evidence is clear and convincing that there was little likelihood that these conditions would be remedied in the near future. The case manager testified to an attempt to inspect Mother's home just over a month prior to the trial. Although no one was at home, the case manager found the outside of the home "very unclean and concerning." At the back door, she found

trash piled up . . . [,] some kind of substance, liquid substance, that was splattered all over the back door and the wall outside. There was a thing of cooked beans that looked like it had been thrown out that had flies and all kinds of bugs surrounding it. There were empty beer cans back there. There w[ere] pet food bowls that didn't have anything in them but bugs.

The case manager described the smell as "pretty horrible." On the front porch, the case manager found partially eaten bread "surrounded by flies," "a sheet that was covering some kind of dirty substance, and a Mason jar full of [an] unidentified liquid."

At Mother's request, the case manager performed an inspection inside the home the day before the trial. The case manager found only little in the way of furniture or evidence that Mother was prepared to care for children.

> In the living room [Mother] had like a laundry line hanging across the . . . room with comforters hanging on them . . . . Then she had a dog in the home and a little kitten. In my opinion the dog was observed to be pretty – his ribs were showing, he was extremely underweight. Went into the kitchen, there was a severe lack of food in the kitchen. In the freezer, all I observed was a pop bottle. And there was some cereal and a scar[c]e amount of cans. [Mother] then took me upstairs where there were three bedrooms. One bedroom was empty except for a dresser and a fish tank and some posters on the wall. Another bedroom had about three twin mattresses that were extremely dirty, stacked up next to the wall. And then another bedroom, where there was a mattress on the floor, a twin-size mattress on the floor, was a fan and a comforter on it. The mattress also appeared to be extremely dirty.

And the case manager noted an overwhelming smell of cigarettes in the home.

The continuation of the parent and child relationship also greatly diminished the children's chances of early integration into a safe, stable, and permanent home. At the time of trial, the children had been in foster care for over three years. They had bonded with their latest foster family and were flourishing in the care of the foster parents. And the foster parents were interested in adopting the children.

4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

Finally, the court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

We conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was appropriate. The Department established by clear and convincing evidence that Mother failed to manifest both an ability and willingness to personally assume legal and physical custody

and financial responsibility for her children.[2] Mother was given the opportunity of a trial home placement, which failed due to continued issues with cleanliness and the presence of inappropriate people. And during the trial home placement, the children had issues with truancy and at least one child developed scabies.

Mother never demonstrated that she could keep her home clean and suitable for children. Her domestic violence issues and mental health issues also remained unaddressed. Despite all the services she was offered, Mother remained unable to care for or support her children.

The evidence is equally clear and convincing that returning the children to Mother's custody would pose a risk of substantial harm to their physical or psychological welfare. Mother's continued inability to maintain a safe, clean home are a risk to the children's safety. So we can conclude the children, more likely than not, faced a real hazard or danger of harm if returned to Mother. *See Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001).

### B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

---

[2] This Court has split over the proper interpretation of the first prong of Tennessee Code Annotated § 36-1-113(g)(14). *See In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11 (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's differing views on the first prong). The split concerns whether a parent must fail to manifest *both* an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest *either* an ability or willingness to assume custody or financial responsibility. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), *with In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Here, under either view, the Department met its burden of proof.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in the children's best interest. Mother argues that the evidence preponderates against the juvenile court's factual findings relative to the first two statutory best interest factors. The first two factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The juvenile court found that Mother failed to make changes in her conduct or circumstances and that lasting change did not appear possible.

The evidence supports the findings made relative to factors one and two. Mother continued to have an unclean home and to allow inappropriate people into her home. She did not finish her domestic violence classes or comply with the recommendations from her mental health assessment. The Department provided family preservation services to teach Mother how to maintain her home, but those efforts had no discernable impact.

Factor three takes into account the regularity of the parent's visitation. *See id.* § 36-1-113(i)(3). And factor four considers whether "a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court found both factors weighed against termination.

The fifth factor focuses on "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." *Id.* § 36-1-113(i)(5). The court found this factor weighed in favor of termination because of the condition of Mother's home. But Mother argues that the factor should weigh against termination because the children had only been in their current foster placement a relatively short period of time.

11

Although the evidence showed that the children had been with their current foster family less than two months, the evidence does not preponderate against the juvenile court's finding that the children would be adversely affected by a return to Mother. So we agree that the evidence relative to the fifth factor weighed in favor of termination.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner[.]"). The juvenile court found that Mother had neglected the children. The children were living in an unsafe environment because of the lack of cleanliness and the presence of perpetrators of domestic violence. There was also a lack of supervision and substance abuse.

Mother complains that, in weighing factors six and seven, the court relied too heavily on "past conditions." But factor six necessarily requires consideration of past conditions. As for factor seven, Mother's argument ignores the inspection of her home that took place the day before the trial.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The court also determined that this factor favored termination. Mother completed a mental health evaluation, but refused to comply with the treatment recommendations.

Factor nine takes into account the payment of child support. *See id.* § 36-1-113(i)(9). The court found that Mother had "paid some child support." And Mother argues that factor nine should weigh against termination. Because the court did not expressly state that the factor weighed for or against termination, for purposes of our review, we accept Mother's contention that factor nine, like factors three and four, weighed against termination.

Still we reach the same conclusion as the juvenile court. The combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's parental rights is in the children's best interest.

## III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on four statutory grounds. The record also contains clear and convincing evidence that termination is in the children's best interest. So we affirm the termination of Mother's parental rights.

_____
W. NEAL MᶜBRAYER, JUDGE